Rehabilitation Center and Workshop, Inc., a Pennsylvania Corporation, formerly known as Rehabilitation Center and Workshop of Western Pennsylvania, Incorporated, Petitioner *v.* Commonwealth of Pennsylvania, Commission on Charitable Organizations, Respondent.

Argued March 9, 1979, before Judges CRUMLISH, JR., DiSALLE and CRAIG, sitting as a panel of three.

*Thomas R. Ceraso*, for petitioner.

*William H. Haubert, II*, Deputy Attorney General, for respondent.

OPINION BY JUDGE CRUMLISH, JR., August 31, 1979:

Rehabilitation Center and Workshop, Inc. (RCW) appeals the denial of its application for renewal of registration by the Commission on Charitable Organizations which determined that RCW was in violation of Section 3(f)(4) of the Solicitation of Charitable Funds Act (Act),[1] 10 P.S. §160-3(f)(4), by virtue of its excessive fund-raising costs.

We affirm.

RCW is a non-profit corporation formed for, among other things, the purpose of establishing a program that includes remunerative employment for the physically, mentally, visually and socially handicapped.[2] It has facilities in Greensburg and New

---

[1] Section 3(f)(4) of the Solicitation of Charitable Funds Act, Act of August 9, 1963, P.L. 628, *as amended*, 10 P.S. §160-3(f)(4).

[2] In its application, RCW described its charitable purpose as follows:

Kensington which implement three basic programs for its "clients," the approximately 250 handicapped individuals (primarily mentally retarded) who are accepted for its services: (1) evaluation, (2) "regular" program for its trainable clients which attempts to bring the client to a level of competitive employment and eventually to refer him to outside employment and (3) the direct mail program which solicits contributions.

At least 75% of the clients' time is spent working in the direct mail program assembling ballpoint pens from components, inserting them and written materials requesting contributions into envelopes, and preparing the envelopes for mailing. The clients working in the mailing program are paid an hourly wage reflecting their productivity, which averaged $.50.

RCW has three sources of income. Its total revenues from July 1, 1975, through June 30, 1976 totaled $1,737,713.55, which included $619,541.01 from governmental grants and $842,167.44 in contributions solicited through the direct mailing program. The remainder of its revenue was derived from sub-contracting work which RCW conducts on its premises for private industry employing its "regular program" clients at an average hourly wage of $1.30. When subcontracting work is not available, the regular program clients work in the direct mailing program.

---

(A) A recognized program of rehabilitation for physically, mentally, visually and socially handicapped individuals with remunerative employment, and one or more other rehabilitation activities of an educational, psychosocial and/or therapeutic nature.

(B) Promoting, operating and establishing other group projects, activities or programs designed and operated for the welfare and security of physically, mentally, visually and socially handicapped individuals.

(C) Soliciting, receiving, investing and expending funds for the accomplishment of the above purposes.

The cost of the mail solicitation program from July 1, 1975 through June 30, 1976,[3] including the cost of training the clients, was $702,728.49. Included in this figure was $83,140.44, paid in wages to the clients and $50,403.18 paid in wages to the staff engaged in supervising the program.

The legislative intent in requiring the registration of charitable organizations who want to solicit contributions is to regulate the soliciting of money and property by or on behalf of charities. Section 1.1 of the Act, 10 P.S. §160-1.1. Section 3(f)(4) of the Act proscribes the expenditure of sums in fund raising that are disproportionate to the revenues raised and provides that no applicant shall be approved if it is found:

> [t]hat solicitation and fund-raising expenses (including not only payments to professional solicitors, but also payments to professional fund-raisers, and internal fund-raising and solicitation salaries and expenses) during any of the three years immediately preceding the date

---

[3] RCW's attempt to renew its registration has had a long and torturous history. It had filed an application for renewal of its registration in October, 1973, which was initially denied by the Commission in April, 1974, under Section 3(f)(4). A hearing was held in June, 1974, before the Commission which issued a final order in November, 1974. RCW appealed to this Court, sought and obtained a supersedeas which permitted it to continue to solicit contributions pending disposition of the appeal. This Court, per Judge WILKINSON, JR., at No. 1592 C.D. 1974, filed June 6, 1975, ordered a remand to the Commission for additional evidence as to whether RCW had inartfully reported some of its fund-raising expenses. A second hearing was held in June, 1976, at which time the 1973 application was declared moot and RCW agreed to submit a new application reflecting more current figures. A third hearing was held on March 30, 1977, to consider the application reflecting the fund-raising expenses incurred by RCW in its 1975-76 fiscal year. This third hearing led to the order which is the subject of this appeal.

of application have exceeded *thirty-five per cent* of the total moneys, pledges, or other property raised or received by reason of any solicitation and/or fund-raising activities or compaigns [sic]. As used in this subsection, the term 'internal fund-raising and expenses' shall include, but not be limited to, such portions of the charitable organization's salary and overhead expenses as were fairly allocable (on a time or other appropriate basis) to its solicitation and/or fund-raising expense. In the event special facts or circumstances are presented showing that expenses higher than thirty-five per cent were not unreasonable, the commission has the discretion to allow such higher expense. (Emphasis added.)

The Commission categorized the costs of the direct mailing program as "fund-raising expenses" that exceeded 35% of RCW's solicited contributions. The Commission expressly refused to exempt RCW from the 35% limitation and denied its application.

On appeal, RCW challenges the evidentiary support for the Commission's determination and argues that its refusal to exempt RCW from the 35% limitation was an error of law.

We recite again our limited scope of review: we are bound to affirm the agency's adjudication unless RCW's constitutional rights have been violated, an error of law has been made by the Commission, or its necessary findings of fact are not supported by substantial evidence. Administrative Agency Law, 2 Pa. C.S. §704.

RCW argues that a major portion of the expenses of the mailing program are actually expenditures for its charitable purpose and not properly considered fund-raising expenses. Only after the proper allocation is made between the portion of the mailing pro-

gram that represents fund raising and the portion that contributes to the clients' rehabilitation, can we determine whether RCW's fund-raising expenses are statutorily excessive.

Substantial evidence is not that which *compels* a certain result but that which a reasonable man may rely on, taking into account the administrative agency's expertise and considering all the evidence and reasonable inferences to be drawn therefrom. *See Jackard Construction Co. v. Pennsylvania Prevailing Wage Appeals Board,* 43 Pa. Commonwealth Ct. 565, 403 A.2d 618 (1979).

Here, the Commission heard testimony from Justin Whaley, coordinator of professional services at RCW and former administrator of Fayette County Mental Health Retardation Program, that work activity in and of itself serves a rehabilitative function and that the mailing program, specifically, was an aid in the development of social attitudes, eye-hand coordination, and gross and fine manipulation.

As a gauge for the expenses of the mailing operation which represented rehabilitation expenses, RCW proposed the use of "Nelson's Theory" which purports to measure the portion of the work and expenses that is rehabilitative in nature. Under Nelson's Theory, the productivity of the "norm" is measured at 100%. If the disabled or handicapped individual is able to produce 25% of that amount, the rehabilitative nature of the work is measured by the percentage difference between the two, *i.e.,* 75%. Because the average RCW client working in the mailing program had a productivity level that was 25% of the norm, RCW urged that the Commission adopt Nelson's Theory and treat 75% of the cost of the mailing program as expenditures for rehabilitation.

The Commission rejected the theory which admittedly has general acceptance only in measuring the

rehabilitative value of subcontracted work which involves a different management incentive than the use of the handicapped in fund raising, and found its use to be inappropriate where the client's wages are already discounted to reflect their actual productivity. We cannot say that the Commission was statutorily required to apply the proffered theory in its attempt to fairly allocate the costs of the mailing operation nor that the Commission erred as a matter of law in rejecting the theory.

Notwithstanding Whaley's testimony, the Commission nonetheless found that the direct mailing program was primarily a fund-raising activity and should be treated as such for the purpose of applying Section 3(f)(4). Upon our review of the extensive record, we find support for its conclusion in light of the fact that many clients had worked for as long as six or seven years in the mailing program without substantial variation in their routine; that ''regular program'' clients whose abilities have progressed beyond the limited abilities used in the mailing program still often spend the major portion of their time working in the mailing program; and that clients are paid on the basis of their productivity. We will not require the Commission to allow a charitable organization that employs legitimate beneficiaries of the charity in its fund-raising operation to discount its fund-raising expenses for that reason alone, absent a legislative directive to that effect.

Further we conclude, as did the Commission, that even if a complete deduction were allowed for the wages of the clients and staff involved in the mailing operation which total $133,543.22, RCW's fund-raising costs would still amount to almost twice the statutory percentage.

Nor will we review the Commission's refusal to exercise its discretion in RCW's favor by exempting

them from the 35% limitation. Absent fraud, bad faith, or an abuse of power, we will not review administrative discretion. *Ernst v. Department of Public Welfare*, 37 Pa. Commonwealth Ct. 643, 391 A.2d 1116 (1978). Our review of this voluminous record reveals no such abuse of discretion or clearly arbitrary action.

Finally, we reject as without merit RCW's contention that the Commission acted arbitrarily in limiting its consideration only to the application filed in October, 1976, and the evidence adduced at the hearing held in March, 1977. At that hearing, the parties stipulated that the decision would be based solely on the most recent application and that resort would be made to the transcripts of prior proceedings only where RCW would have a chance to present rebuttal argument. RCW, having objected at the hearing to substantive use of the prior proceedings' transcripts, cannot now be heard to complain of the Commission's action in effectively sustaining its objection.[4]

---

[4] The transcript contains the following discussion by Mr. Ceraso, counsel for RCW, and Mr. Adams, a member of the Commission, on this issue:

MR. ADAMS: The second thing is, I think that possibly, we could stipulate to the fact that—with his agreement and the Commission's agreement—that the application will stand or fall on the present application for the current calendar year and on the facts submitted and will not stand on prior applications. But I think the reason for putting into the record the prior transcripts and records are [sic] to have a complete history of this matter for the Commission to review, and I would recommend it.

MR. CERASO: I would not stipulate to that.

MR. ADAMS: Right, Mr. Ceraso, can we reach this agreement: One, the Commission will reach its decision based solely upon the application before it but, two, we'll have access also to the transcripts of the prior proceedings, since there have been prior proceedings, and, three, that you will be given an opportunity, if you so desire and it becomes necessary for you to do so—when I say 'necessary' I mean

Accordingly, we

ORDER

AND Now, this 31st day of August, 1979, the order of the Commission on Charitable Organizations in the above-captioned case dated March 22, 1978, is hereby affirmed.

---

in the event that there's a possibility of an unfavorable determination—that you will have an opportunity to present such briefs as you deem appropriate after you've had an opportunity to examine the transcripts.

MR. CERASO: Sure. Mr. Adams, let me say this; I don't even object to you making the decision based on review of the entire record. All I'm saying is that, if that is the situation, that I have a right to address myself to the type of thing that you previously mentioned as far as what has happened historically up to the present time.

MR. ADAMS: By way of argument?

MR. CERASO: Yes. That's all I'm saying.